# <u>Exhibit A</u>

ORIGIN

23484519

Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**FILED**
ALAMEDA COUNTY

SEP 1 0 2020

CLERK OF THE SUPERIOR COURT
By: _____ Deputy

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

| | |
|---|---|
| JAMES HOLTZ and RICK SHERMAN, <br><br> Plaintiffs, <br><br> v. <br><br> CHINA GREEN AGRICULTURE, INC., TAO LI, YONGCHENG YANG, KEN REN, and ZHUOYU RICHARD LI, <br><br> Defendants. | Case No.: **HG20073782** <br><br> **COMPLAINT** FOR: <br><br> (1) NEGLIGENT MISREPRESENTATION; AND (2) COMMON LAW FRAUD. <br><br><br> **JURY TRIAL DEMANDED** |

BY FAX

Plaintiffs James Holtz and Rick Sherman ("Plaintiffs"), by their undersigned attorneys, files this Complaint against Defendants China Green Agriculture, Inc. ("China Green" or the "Company"), Tao Li, Yongcheng Yang, Ken Ren, and Zhuoyu Richard Li (together with the Company, the "Defendants") for negligent misrepresentation and common-law fraud as a directors and/or officers of China Green. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation

conducted by and through Plaintiffs' attorneys, which included, among other things, a review of public documents, wire and press releases published by and regarding China Green, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.     This is an action that seeks to remedy wrongdoing committed by the officers and directors of China Green. This action arises from the misrepresentations and omissions of material fact made by Defendants in their periodic quarterly and annual reports and financial statements filed with the U.S. Securities Exchange Commission ("SEC").

2.     Though China Green is a Nevada corporation, its operations take place almost entirely in China. China Green earned more than 99% of its purported revenues from sales of humic acid fertilizer, agricultural products, and related products in China.

3.     At all relevant times China Green, in each of its quarterly and annual financial statements filed with the SEC, it represented that its financial statements were presented in accordance with generally accepted accounting principles ("GAAP").

4.     China Green operates through several subsidiaries, the financial results of which are consolidated and included in its periodic reports to the SEC. Its operating subsidiaries include Beijing Gufeng Chemical Products Co., Ltd. ("Gufeng") and Shaanxi TechTeam Jinong Humic Acid Product Co., Ltd. ("Jinong").

5.     China Green repeatedly represented in its filings with the SEC that it routinely took allowances for doubtful accounts on accounts receivable aged more than 180 days for operations at Gufeng and Jinong.

6.     In fact, China Green's financials reveal that it has not, in fact, taken allowances for doubtful accounts as Gufeng and Jinong's accounts receivable have aged beyond 180 days. Instead, it has accrued an ever-growing pile of aging receivables which it will never collect—artificially inflating its assets, income, and results of operations.

7.      In addition, China Green reported inventories at a dollar valuation which, at the prevailing market price for the Company's principal product—humic acid fertilizer—would imply a volume of inventory on-hand in the first quarter of fiscal year 2020 of more than 1 billion pounds, occupying approximately 25 million square feet—a volume China Green's reported facilities could not possibly accommodate.

8.      In recent periods, China Green has taken a series of large, completely unexplained charges—deemed general & administrative expenses ("G&A")—charges which in the third quarter of fiscal year 2020 amounted to about triple the total market capitalization of the Company.

9.      There can be only one conclusion: no such collectible receivables or inventory exists. Each of the above-identified material inconsistencies in China Green's publicly-filed financial reports evidences that the vast majority of China Green's reported accounts receivable and inventory have been fictional and without basis in reality. Thus, China Green's reported assets have been misstated in material respects, and China Green's investors have been deceived.

10.     Plaintiffs purchased significant investments in China Green. Plaintiffs relied upon Defendants' periodic filings and the financial reports contained therein in deciding to purchase and to retain his holdings of China Green securities.

11.     As a direct and proximate consequence of Defendant's misrepresentations, omissions, and active concealment of the truth, Plaintiffs have suffered losses for which they seek redress through this litigation.

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, § 10, because this case is a cause not given by statute to other trial courts.

13.     The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

14.     Venue is proper in this Court because Plaintiff Holtz resides in this county and a substantial portion of the transactions and wrongs complained of herein occurred in this County, and

Defendant has received substantial investments in this County by marketing its securities here and engaging in numerous activities that had an effect in this County.

## PARTIES

15.    Between June 2011 and February 2020, Plaintiff Holtz invested approximately $5,474,226 in China Green securities, through brokerage accounts for himself, his children, and in trusts for the benefit of his family. While he has purchased and sold shares at various times throughout that period, Plaintiff Holtz has continuously held shares of China Green since his first purchase, and as of the date of this Complaint, holds more than 170,000 shares. To date, Plaintiff Holtz has realized and unrealized net losses of approximately $2.3 million.

16.    Plaintiff Sherman invested in China Green securities between October 2016 and May 2020 and while he has purchased and sold shares at various times, he has continuously held shares of China Green throughout that period. Plaintiff Sherman has realized and unrealized net losses of approximately $600,000.

17.    Plaintiffs, as set forth herein, were induced to purchase and to hold China Green securities and were economically damaged thereby.

18.    Defendant China Green, through its subsidiaries, states in its SEC filings that it is engaged in the research, development, production, distribution and sale of humic acid-based compound fertilizer, compound fertilizer, blended fertilizer, organic compound fertilizer, slow-release fertilizers, highly-concentrated water-soluble fertilizers and mixed organic-inorganic compound fertilizer and the development, production and distribution of agricultural products. China Green is incorporated in the state of Nevada with its head office located at Third floor, Borough A, Block A, No. 181, South Taibai Road, Xi'an, Shaanxi Province, PRC 710065.

19.    Defendant Tao Li ("Li Sr.") served as the Company's Chairman of the Board and Chief Executive Officer ("CEO") from December 26, 2007 until his death in December 2017. He also served as the Company's President from December 26, 2007 to May 5, 2016. Upon his death, he left the Company in the control of his son, Zhuoyu Richard Li.

20.   Defendant Ken Ren ("Ren") served as the Company's Chief Financial Officer ("CFO") from April 23, 2010 to November 2017.

21.   Defendant Yongcheng Yang ("Yang") has served as the Company's chief financial officer and chief accounting officer from November 2017 to the present.

22.   Defendant Zhuoyu Richard Li ("Li Jr.") has served as the Company's President since May 11, 2016. He has also served as the Company's CEO since December 2017 and as the Company's CFO from November 2017 to December 2017.

23.   Defendants Li Sr., Ren, Yang, and Li Jr. are collectively referred to herein as the "Individual Defendants."

24.   Each of the Individual Defendants:

(a)   directly participated in the management of the Company;

(b)   was directly involved in the day-to-day operations of the Company at the highest levels;

(c)   was privy to confidential proprietary information concerning the Company and its business and operations;

(d)   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)   approved or ratified these statements in violation of the federal securities laws.

25.   China Green is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

26.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to China Green under *respondeat superior* and agency principles.

27.     At all relevant times, as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture.

28.     Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants.

29.     At all times relevant hereto, Defendant China Green and its operating subsidiaries were the alter egos of Defendants Li Sr., Ren, Yang, and Li Jr., and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist. Specifically, at all times relevant hereto, Defendants Li Sr. and Li Jr. (1) controlled the business and affairs of China Green, including any and all of their affiliates; (2) commingled the funds and assets of the corporate entities, and diverted corporate funds and assets for their own personal use; (3) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (4) inadequately capitalized China Green's subsidiary entities; (5) used the same office or business location and employed the same employees for all the corporate entities; (6) used the corporate entities as mere shells, instrumentalities or conduits for themselves and/or their individual businesses; (7) manipulated the assets and liabilities between the corporate entities to conceal the true nature and extent of the entities' business activities; and/or (8) used the corporate entities to shield against personal obligations, and in particular the obligations as alleged in this Complaint.

30.     At all times relevant to this Complaint, Defendants, and each of them, were acting as the agents, employees, and/or representatives of each other, and were acting within the course and scope of their agency and employment with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

31.     As members of the fraudulent schemes alleged more fully below, each of the Defendants participated and acted with or in furtherance of said conspiracy, or aided or assisted in carrying out the purposes of the fraudulent scheme, and have performed acts and made statements in furtherance of the scheme and other violations of California law.

32.     Each Defendant acted both individually and in alignment with the other Defendants with full knowledge of their respective wrongful conduct. As such, Defendants conspired together, building upon each other's wrongdoing, in order to accomplish the acts outlined in this Complaint.

33.     Defendants China Green and the Individual Defendants are collectively referred to herein as "Defendants."

## MISREPRESENTATIONS AND OMISSIONS

### Materially False and Misleading
### Statements Issued During the Relevant Time

34.     On or around September 17, 2015, China Green filed its annual report on Form 10-K ("2015 10-K") with the SEC for the fiscal year ended June 30, 2015.

35.     On or around October 7, 2016, China Green filed its annual report on Form 10-K ("2016 10-K") with the SEC for the fiscal year ended June 30, 2016.

36.     On or around October 19, 2017, China Green filed its annual report on Form 10-K ("2017 10-K") with the SEC for the fiscal year ended June 30, 2017. China Green subsequently filed two amendments on Forms 10K/A, on March 16, 2018 ("2017 10-K/A1") and April 13, 2018 ("2017 10-K/A2").

37.     On October 19, 2018, China Green filed its annual report on Form 10-K ("2018 10-K") with the SEC for the fiscal year ended June 30, 2018.

38.     On or around October 15, 2019, China Green filed its annual report on Form 10-K/A ("2019 10-K") with the SEC for the fiscal year ended June 30, 2019.

39.     On or around November 19, 2019, China Green filed its quarterly report on Form 10-Q ("1Q20 10-Q") with the SEC for the fiscal quarter ended September 30, 2019.

40.     On or around February 14, 2020, China Green filed its quarterly report on Form 10-Q ("2Q20 10-Q") with the SEC for the fiscal period ended December 31, 2019.

41.     On or around May 15, 2020, China Green filed its quarterly report on Form 10-Q ("3Q20 10-Q") with the SEC for the fiscal period ending March 31, 2020.

42.     The 2015 10-K, 2016 10-K, 2017 10-K, 2017 10-K/A1, 2017 10-K/A2, 2018 10-K, 2019 10-K, and the 1Q20 10-Q, 2Q20 10-Q, and 3Q20 10-Q were prepared negligently and/or with intent to mislead and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation, as detailed herein.

**A.   False & Misleading Accounts Receivable and Inadequate Allowance for Bad Debts**

43.     Each of the Company's above-listed reports filed with the SEC for FY 2014, 2015, and 2016 contained the following language (with immaterial differences from year to year):

*The Company's policy is to maintain reserves for potential credit losses on accounts receivable.* Management regularly reviews the composition of accounts receivable and analyzes customer credit worthiness, current economic trends and changes in customer payment patterns to evaluate the adequacy of these reserves at each year-end. *Accounts considered uncollectible are written off through a charge to the valuation allowance.*

Emphases added.

44.     The Company's reports for FY 2017, FY 2018, FY 2019, and the first, second, and third quarters of FY 2020 also contained the following language:

*Any accounts receivable of Jinong and Gufeng that is outstanding for more than 180 days will be accounted as allowance for bad debts....*

Emphasis added.

45.     These statements were materially false and misleading because China Green did not, in fact, timely record bad debt allowances for receivables as they aged, instead carrying balances of accounts receivable on its books well beyond the 180-day limitations stated in its SEC filings, causing accounts receivable to be materially overstated at all relevant times.

46.     In its 2014 10-K, the Company reported on its accounts receivable and bad debts, stating in relevant part:

1   We had accounts receivable *of $88,781,608 as of June 30, 2014, as compared to*

2   *$85,323,442* as of June 30, 2013, *an increase of $3,458,166 or 4.1%....* In order to

3   respond to the cash flow shortage caused by the tightening financing and slowing

4   economy growth encountered by some of our distributors, the company launched such

5   a policy since the third quarter of fiscal year 2012 enabling such distributors take full

6   advantage of the 180-day credit terms.

7   *Allowance for doubtful accounts in account receivable for the year ended June 30,*

8   *2014 was $237,594, an increase of $115,319 or 94.3% from $122,275 as of June 30,*

9   *2013.* And the allowance for doubtful accounts as a percentage of accounts receivable

10   was 0.27% as of June 30, 2014 and 0.29% as of June 30, 2013.

11   Emphasis added.

12   47.   The miniscule allowance for accounts receivable reported in the Company's filings—

13   0.27% and 0.29% in 2014 and 2013, respectively—implied that the Company assessed the risk of

14   uncollectability on these accounts to be extremely and unrealistically low. In reality, the Company

15   knew or had reason to know that a more significant portion of these accounts would likely be

16   uncollectible, and should have taken more significant allowance to account for that risk. China Green's

17   unrealistically low allowance for accounts receivable caused the value of those receivables to be

18   overstated, misleading investors.

19   48.   In its 2015 10-K, the Company reported on its accounts receivable and bad debts for

20   its Gufeng subsidiary, stating in relevant part:

21   We had accounts receivable of $68,528,598 as of June 30, 2015, as compared to

22   $88,781,608 as of June 30, 2014, a decrease of $20,253,010 or 22.8%. As of June 30,

23   2015, Gufeng had accounts receivable of $895,580, a decrease of $17,761,578, or

24   95.2%, comparing to $18,657,158 as of June 30, 2014. The decrease is mainly due to a

25   number of large clients paid up their account payable to Gufeng during this year.

26   *Allowance for doubtful accounts in account receivable for the year ended June 30,*

27   *2015 was $307,923, an increase of $70,329 or 29.6% from $237,594 as of June 30,*

28

*2014.* And the allowance for doubtful accounts as a percentage of accounts receivable was 0.45% as of June 30, 2015 and 0.27% as of June 30, 2014.

Emphasis added.

49.     In its 2016 10-K stated:

*We had accounts receivable of $117,055,376 as of June 30, 2016, as compared to $68,528,598 as of June 30, 2015, an increase of $48,526,778 or 70.8%.* As of June 30, 2016, Gufeng had accounts receivable of $47,346,062, an increase of $46,450,482, comparing to $895,580 as of June 30, 2015... *Allowance for doubtful accounts in accounts receivable for the fiscal year ended June 30, 2016 was $397,123, an increase of $89,200 or 30.0% from $307,923 as of June 30, 2015. And the allowance for doubtful accounts as a percentage of accounts receivable was 0.34% as of June 30, 2016 and 0.45% as of June 30, 2015.*

Emphasis added.

50.     The 2017 10-K stated:

*As of June 30, 2017, and 2016, the Company had accounts receivable of $149,709,758 and $117,936,342, net of allowance for doubtful accounts of $9,457,423 and $1,362,852, respectively. ...*

*...As of June 30, 2017, Gufeng had accounts receivable of $59,002,630, an increase of $11,656,568, compared to $47,346,062 as of June 30, 2016....*

51.     Each of these statements were false and misleading for the same reasons stated above, in that they allocated only a tiny allowance for accounts receivable reported in the Company's filings, which suggested to investors that these accounts were almost certain to be collected in substantial part. In reality, the Company knew or had reason to know that a more significant portion of these accounts would likely be uncollectible, and the unrealistically low allowance taken caused the value of those receivables to be overstated, misleading investors.

52.     In the 2018 10-K, China Green finally began to admit to investors that their accounts receivable might not be collectible in their entirety, charging a disproportionately large percentage of

1    outstanding receivables off as allowance for doubtful accounts. However, even this larger charge failed

2    to adequately reflect the extent to which the accounts receivable were bogus or uncollectible. The

3    Company reported:

4          We had accounts receivable of *$199,012,733 as of June 30, 2018, as compared to*

5          *$141,665,179 as of June 30, 2017, an increase of $57,347,554 or 40.5%.* As of June

6          30, 2018, *Gufeng had accounts receivable of $102,113,316, an increase of*

7          *$43,110,686 or 73.1%, compared to $59,002,630 as of June 30, 2017. ....*

8          Allowance for doubtful accounts in account receivable for the fiscal year ended June

9          30, 2018 was *$24,551,796, an increase of $15,094,373 or 159.6% from $9,457,423 as*

10         *of June 30, 2017*. And the allowance for doubtful accounts as a percentage of accounts

11         receivable was 12.3% as of June 30, 2018 and 6.3% as of June 30, 2017.

12   Emphasis added.

13       53.    In its 2018 10-K, China Green first revealed to investors that a significantly larger

14   fraction of its reported receivables were likely to be uncollectible. However, these statements remained

15   incomplete and misleading because they continued to report that the Company was appropriately aging

16   out receivables that had been outstanding for more than 180 days. In reality, analysis of China Greens

17   reported receivables, compared with its reported sales during the period, demonstrate that the

18   Company was maintaining receivables on its books well beyond the 180-day period.

19       54.    In its 2019 10-K, China Green reported still-larger allowances against its ever-growing

20   pile of reported accounts receivable:

21         *We had accounts receivable of $178,705,570 as of June 30, 2019, as compared to*

22         *$199,012,733 as of June 30, 2018, a decrease of $20,307,163 or 10.2%.* As of June

23         30, 2019, Gufeng had accounts receivable of $85,432,163, a decrease of $16,681,153,

24         or 16.3%, compared to $102,113,316 as of June 30, 2018. ... *Allowance for doubtful*

25         *accounts in accounts receivable for the fiscal year ended June 30, 2019 was*

26         *$33,515,410, an increase of $8,963,614 or 36.5% from $24,551,796 as of June 30,*

27         *2018. And the allowance for doubtful accounts as a percentage of accounts*

28

1   *receivable was 18.8% as of June 30, 2019 and 12.3% as of June 30, 2018.*

2   55.    The Company's 2019 10-K continued to partially reveal the collectability problem

3   China Green faced, but it remained materially incomplete and misleading in continuing to

4   misrepresent that China Green was aging out receivables aged more than 180 days and that the

5   underlying accounts receivable were legitimate and more likely than not to be collectible in substantial

6   part—which, in fact, they were not.

7   56.  .  In its 1Q20 10-Q, the Company stated with respect to accounts receivable and

8   allowance for doubtful accounts:

9       *As of September 30, 2019, and June 30, 2019, the Company had accounts receivable*

10      *of $138,984,949 and $145,190,160, net of allowance for doubtful accounts of*

11      *$27,993,503 and $33,515,410, respectively...*

12  Emphasis added.

13  57.    In its 2Q20 10-Q, the Company stated with respect to accounts receivable and

14  allowance for doubtful accounts:

15      *As of December 31, 2019, and June 30, 2019, the Company had accounts receivable*

16      *of $156,080,809 and $145,190,160, net of allowance for doubtful accounts of*

17      *$27,999,039 and $33,515,410, respectively...*

18  Emphasis added.

19  58.    In its 3Q20 10-Q, the Company stated with respect to accounts receivable and

20  allowance for doubtful accounts:

21      *As of March 31, 2020, and June 30, 2019, the Company had accounts receivable of*

22      *$166,452, 189 and $145,190,160, net of allowance for doubtful accounts of*

23      *$34,494,969 and $33,515,410, respectively...*

24  Emphasis added.

25  59.    Each of the above statements misled investors in China Green securities as to the

26  amount and collectability of accounts receivable reported in the Company's periodic financial

27  statements. As further discussed herein, beginning in the fourth quarter of FY 2019, the Company

28

began backing out revenues and accounts receivable recorded in preceding periods by recording huge, unexplained, and inexplicable charges for general & administrative expenses ("G&A").

60.     Under applicable U.S. Generally-Accepted Accounting Principles ("GAAP"), G&A expenses consist of regular expenses incurred in the day-today operation of a business that may not be directly tied to a specific function or product. G&A expenses usually pertain to miscellaneous business overhead costs, e.g. rent, utilities, insurance premiums, professional fees, and administrative salaries. Such regular expenses ordinarily vary little from period to period.

61.     China Green has recorded G&A amounting to *17.8%* of reported sales in Q4 2019, *32%* of reported sales in Q1 2020, *66.1%* of reported sales in Q2 2020, and *68.5%* of reported sales in Q3 2020. China Green's total reported G&A for FY 2019 was $22.57 million. In the first three quarters of FY 2020 alone, the Company has recorded G&A of $107.9 million, exceeding any previous year by *more than 300%*, or *a factor of 4*.

62.     These large and unexplained charges had the effect of negating large portions of China Green's reported earnings in the later periods, leading it to report operating losses where in the absence of such unusual charges, it would have recorded operating profits.

63.     There can be no legitimate explanation for the accrual of unexplained G&A expenses exceeding 60% of gross revenues in a single period, and China Green has offered none. Instead, it is clear that through these G&A charges, China Green has fraudulently concealed the removal from its books of substantial fictitious and uncollectible accounts receivable recorded in connection with fictitious sales and revenues recorded in prior periods. Thus, China Green has indirectly revealed that its revenues and profits recorded in previously-filed statements of financial condition—upon which Plaintiffs relied in determining to purchase and to continue to hold China Green's securities—were falsified.

**B. False & Misleading Inventory-on-Hand**

64.     Each of the Company's above-listed reports filed with the SEC for fiscal years 2014-2020 contained false and misleading statements concerning the amount and value of inventory on hand. The amount of inventory that China Green reported in each period was improbably high—in

fact, it was impossibly high, given that inventory of humic acid fertilizer valued at the amounts China Green reported would occupy physical space far exceeding any capacity China Green had to store such inventory at Gufeng or any of its other facilities.

65.    These statements were materially false and misleading because China Green did not, in fact, possess or control such voluminous inventory, and/or substantially overvalued their inventory on-hand at Gufeng.

66.    The 2014 10-K also reported on China Green's inventory:

*We had an inventory of $75,486,898 as of June 30, 2014, as compared to $34,511,167 as of June 30, 2013, an increase of $40,975,731, or 118.7%.* The principal reason for the increase is attributed to Gufeng's inventory. *As of June 30, 2014, Gufeng's inventory was $58,165,860 ...*

Emphasis added.

67.    The 2015 10-K also reported on its inventory as follows:

*We had inventories of $101,302,947 as of June 30, 2015, as compared to $75,486,898 as of June 30, 2014, an increase of $25,816,049, or 34.2%.* The principal reason for the increase is attributed to Gufeng's inventory. *As of June 30, 2015, Gufeng's inventory was $82,342,457...*

Emphasis added.

68.    The 2016 10-K also reported the follows with respect to China green's inventory:

*We had inventories of $87,436,315 as of June 30, 2016, as compared to $101,302,947 as of June 30, 2015, a decrease of $13,866,632, or 13.7%. ... As of June 30, 2016, Gufeng's inventory was $60,183,741 as of June 30, 2016, compared to $82,342,457 as of June 30, 2015...*

Emphasis added.

69.    The 2017 10-K reported inventories of $78,013,891 for June 30, 2017, compared to $87,436,315 for the same date in 2016. They also stated:

During the year ended June 30, 2017, the Company sold compound fertilizers (finished

goods) to certain parties at market price, and purchased equivalent amount of simple fertilizers (raw material) from the same parties also at market price. The simple fertilizers purchased, along with other materials were used in the Company's production facility to manufacture compound fertilizers.

*… As of June 30, 2017, Gufeng's inventory was $54,444,465, compared to $60,183,741 as of June 30, 2016…*

Emphasis added.

70.    The 2018 10-K reported:

*We had inventories of $53,784,814 as of June 30, 2018, as compared to $78,013,891 as of June 30, 2017, a decrease of $24,229,077, or 31.1%. …As of June 30, 2018, Gufeng's inventory was $31,617,519, compared to $54,444,465 as of June 30, 2017, a decrease of 22,826,946, or 41.9%.*

Emphasis added.

71.    The 2019 10-K likewise reported:

*We had inventories of $162,013,889 as of June 30, 2019, as compared to $53,784,814 as of June 30, 2018, an increase of $108,229,075, or 201.2… As of June 30, 2019, Gufeng's inventory was $141,210,160, compared to $31,617,519 as of June 30, 2018, an increase of $109,592,641, or 346.6%.*

Emphasis added.

72.    The 1Q20 10-Q reported inventories of:

*We had inventories of $146,848,526 as of September 30, 2019, as compared to $162,013,889 as of June 30, 2019, a decrease of $15,165,363, or 9.4%. …As of September 30, 2019, Gufeng's inventory was $125,956,806, compared to $141,210,160 as of June 30, 2019, a decrease of $15,253,354, or 10.8%.*

Emphasis added.

73.    The 2Q20 10-Q reported inventories of:

*We had inventories of $114,448,765 as of December 31, 2019, as compared*

*to $162,013,889 as of June 30, 2019, a decrease of $47,565,124, or 29.4%. ... As of December 31, 2019, Gufeng's inventory was $91,994,547, compared to $141,210,160 as of June 30, 2019, a decrease of $49,215,613, or 34.9%.*

Emphasis added.

74.     The 3Q20 10-Q reported inventories of:

*We had inventories of $62,234,683 as of March 31, 2020, as compared to $162,013,889 as of June 30, 2019, a decrease of $47,565,124, or 29.4%. ... As of March 31, 2012, Gufeng's inventory was $35,385,274, compared to $141,210,160 as of June 30, 2019, a decrease of $105,824,886, or 74.9%.*

75.     Each of China Green's above-listed statements concerning the amount and value of inventory on hand at Gufeng was false and misleading, for the reasons discussed below. China Green's reported value of inventory on hand regularly implied a quantity of humic acid fertilizer the volume of which substantially exceeded any space available for China Green to store, as further discussed in ¶88-90, *infra*.

## DEFENDANTS' STATEMENTS WERE FALSE

76.     The statements contained in the foregoing were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:

(a)     Contrary to their statements, the Company did not in fact write down accounts receivable aged over 180 days from Gufeng and Jinong, and a large fraction of these receivables were not in fact collectible, a fact which China Green has only recently begun to admit; and

(b)     The reported quantity of inventory on-hand at Gufeng was illusionary, as the facility there would not have been able to accommodate all the reported inventory on hand.

**China Green Misrepresented that it Wrote Off Aged and Uncollectible Receivables**

77.     U.S. GAAP states that the conditions under which receivables exist usually involve some degree of uncertainty about their collectability, in which case a contingency exists. The loss from uncollectible receivables needs to be reflected on the income statement and balance sheet in order to present a fair depiction of the state of the company. For instance, if an organization made a sale to a customer on credit one year ago and that amount is still outstanding, there is a good chance that the money will never be collected. Presenting that sale on the balance sheet as an account receivable would be misleading to the users of the financial statements. U.S. GAAP requires the accrual of losses from uncollectible receivables if a loss is probable and the amount of the loss can be reasonably estimated. FASB ASC 450-20-25-2.

78.     China Green stated repeatedly that they aged their receivables and took allowances for doubtful accounts on receivables more than 180 days old at Jinong and Gufeng. However, a review of the Company's reported financials establishes that this cannot be true.

79.     For example, China Green's 1Q20 10-Q reports Gufeng's accounts receivable net of allowance for doubtful accounts as $72.72 million.  CGA also states, "Any accounts receivable of Jinong and Gufeng that are outstanding for more than 180 days will be accounted as allowance for bad debts…" Gufeng's sales for the previous 180 days were $45.6 million.  Thus, the maximum accounts receivable net of allowance for doubtful accounts for the same 180 days would be $45.6. The only plausible explanations are that (a) the accounts receivable do not exist, or (b) China Green has failed to charge 180+ day accounts to the allowance for doubtful accounts, misleading investors into thinking that the receivables are less than 180 days old. In any case, China Green's financial statements are materially false and/or misleading.

80.     China Green reported total sales for $38,576,301 for Gufeng in the first and second quarters of FY 2020, which is less than half of the accounts receivable of $91.37 million reported for the same period. It is not possible for accounts receivable for the 180 days constituting Q1 and Q2 of FY 2020 to exceed sales for the same time period. The same is true for China Green's reported sales from Jinong. The only reasonable conclusion is that a significant portion of the reported accounts

receivable are aged more than 180 days, and therefore, should have resulting in a concomitant allowance for bad debts, pursuant to China Green's stated policy. So, either China Green is not making allowances accounts aged more than 180 days, as it has stated, or the accounts receivable do not exist. In either case, China Green's financial statements are not prepared in conformity with U.S. GAAP and are materially false and/or misleading.

### China Green Materially Overstated Value of Inventory

81.     In addition to its overstated accounts receivable, China Green has throughout the Relevant Time reported a valuation of its inventory which is simply implausible as a matter of physics.

82.     China Green's principal product is humic acid organic fertilizer. Humic acid composes the principal organic fraction of soil, peat, and coal—and is extracted from these soil sources as humic and fulvic acids in strongly-basic aqueous solution, from which humic acid is subsequently precipitated by addition of hydrochloric acid, which leaves the less-desirable fulvic acid in solution. Humic acid is not technically a fertilizer at all, but rather a soil additive or soil conditioner—it assists in the dissolution and uptake of nutrients in the soil by plants, rather than serving as a nutrient itself. Humic acid is known to be a beneficial soil additive. Studies have shown that humic acid improves nutrient uptake from the soil, improves water availability and drought resistance, improves soil microbial activity, etc. Unfortunately, humic acid cannot be used or co-formulated with many commercial fertilizers, pesticides, adjuvants, plant growth regulators, and other beneficial substances for plants because it has limited solubility in acidic aqueous solutions and in solutions containing calcium, iron, magnesium, manganese, or zinc ions. Humic acid is most efficiently stored as a solid powder or granule, in which form is *retails* today for approximately US $280-$350 per metric ton.

83.     As an example, in China Green's 1Q20 10-Q, CGA reported fertilizer sales from Gufeng at a cost per metric ton of $266. They also reported the value of Gufeng's inventory as $125,956,806. This corresponds to over 1 billion pounds of inventory (in the most space-efficient, solid form), at solid humic acid fertilizer's weight of 42 pounds per cubic foot. This amount of inventory would occupy over 25 million cubic feet, corresponding to a 50-foot high pile over 700 feet to a side. Gufeng has a large facility near Beijing (about 12 acres) with 193,000 square feet of storage

1    buildings. The amount of the inventory CGA reports would completely fill these building to a height

2    of over 130 feet. A review of satellite photographs Gufeng's facility reveals no structure of space

3    capable of accommodating that much inventory (see below image[1]).

4



5

6

7

8

9

10

11

12    84.    The only plausible conclusion is that the inventory is overstated or does not exist. In

13    either case, China Green's financial statements are materially false and/or misleading.

14    **China Green Backs Out Fraudulent Receivables and Inventory Through**

15    **Huge, Unexplained General & Administrative Expense Charges**

16    85.    In China Green's 2Q20 10-Q filed on February 14, 2020, the company reported a pretax

17    loss of $27,798,018, driven by an extremely large charge to General & Administrative Expenses

18    ("G&A") of $32,761,531 (equal to 66% of sales).  The G&A charge for the quarter was close to twice

19    the total market value of the Company's stock.  Without such a large (and unusual) G&A charge,

20    however, the company would have reported a small profit.  The G&A charge for the first six months

21    of the fiscal year was $49,103,323 compared to $2,209,728 in the previous fiscal year. The nature of

22    this G&A charge is unexplained in the Company's filings. However, the 10-Q does contain language

23    that, "Accounts considered uncollectible are written off through a charge to the valuation allowance."

24    While the Company's allowance for doubtful accounts showed little change between the first and

25    second quarters of FY 2020 from $27,993,503 in the first quarter to $27,999,019 in the second

26    quarter—a large charge to allowance for doubtful accounts offset by a reduction to the valuation

27    _____

28    [1] Source: Google Earth.

allowance for accounts considered uncollectible would result in a net-zero change in the allowance and a substantial charge-off. Defendants are thus engaging in a scheme to conceal the charge-off of illusionary and uncollectible accounts receivable on their financial statements through large, unexplained G&A expenses.

86.     In its 3Q20 10-Q on May 15, 2020, China Green reported a loss of $57 million, or $8.18 per share, for this single three-month period—a single-quarter loss of nearly *three times* the market capitalization of the stock. This loss was due entirely to the recognition that $58.8 million in China Green's accounts receivable were uncollectible and further evidence that they were previously fraudulently misrepresented.

87.     For the third quarter of FY 2020, China Green reported net accounts receivable of approximately $166 million, $101.7 million of which were attributed to Gufeng. The Company's provision for doubtful accounts for the same quarter (derived by subtracting the year-to-date provision in the third quarter from the immediate previous quarter) was approximately $41.9 million. However, China Green's balance sheet reflects an increase in allowance for doubtful accounts of only $6.8 million for the quarter. The only way to explain the discrepancy is that China Green has written off as uncollectible a significant fraction of its reported accounts receivable. However, China Green wholly failed to report this material fact in its filings.

88.     In addition, the third quarter 10-Q again reported a net increase in accounts receivable for Gufeng that exceeded its previous six-months sales—increasing receivables by of $101.7 on sales of on $79.4 million. Similarly, China Green reported net accounts receivable at Jinong of $29.5 million exceeds its previous 6-months sales of $25.8 million. This reveals that CGA is not, in fact, recording an allowance for bad debts on accounts outstanding for more than 180 days as it claims in its SEC filings.

89.     The reported inventory for Gufeng in this period was $35.4 million, a decrease of $56.6 million from the second quarter of 2020. The amount of this decrease was more than Gufeng's reported cost of goods sold for the quarter of $50.1 million. This implies that the Company wrote off several

million dollars of inventory during the quarter. However, there was not mention of a write-down of inventory in the 10-Q, which erroneously implies that there was none.

90.     Each of these discrepancies in the Company's reported results evidences that China Green is surreptitiously writing off fictitious receivables and fictitious inventory reported on its books in the prior periods. The Company reported no substantive event or change in economic circumstances that would justify such unprecedented write-offs in a single period under U.S. GAAP, and indeed, negligently and/or fraudulently misrepresented the nature of the charges to general and administrative expenses without explanation or justification.

## DEFENDANTS KNEW THEIR STATEMENTS WERE FALSE AND MISLEADING

91.     As alleged above, the Defendants made representations of material fact to Plaintiffs about the financial condition and operations of the Company.

92.     Those representations were false and misleading when made.

93.     On information and belief, each of the Individual Defendants knew that the representations were false and misleading when made, or that they made those representations recklessly without regard to whether they were true or false.

94.     On information and belief, Individual Defendants made those representations with an intent to defraud and deceive Plaintiffs and other investors similarly-situated, and to induce Plaintiffs and others to rely upon them and act in reliance upon them.

95.     The true facts were that reported inventories were grossly overstated, and the Company's accounts receivable were fictitious or were carried without accruing appropriate allowances for bed debt in accordance with the what Defendants represented the Company's policy to be.

96.     On information and belief, Defendants intended that investors, including Plaintiffs, would rely upon and act on the basis of these misrepresentations in deciding whether to purchase and retain China Green's securities.

97.     Defendants benefitted from their misrepresentations to investors in the form of increased investment in China Green and inflation of China Green's stock price throughout the relevant period.

**PLAINTIFFS JUSTIFIABLY RELIED UPON DEFENDANTS' FALSE STATEMENTS**

98.     Plaintiffs reviewed China Green's statements in the above-cited periodic reports filed with the SEC. Each of the Plaintiffs read these statements, including the information related to reported account receivable, inventory, and cash on hand, and relied upon that information in deciding whether to retain China Green's securities.

99.     Plaintiffs read, reviewed, considered, and reasonably relied upon each of Defendants' above-cited filings with the SEC, and Defendants false and misleading statements and omissions therein caused and induced Plaintiffs to retain and continue to hold China Green securities.

100.    Plaintiffs also considered and reasonably relied upon Defendants' above-cited filings in deciding whether to purchase additional China Green securities, and they did in fact purchase additional China Green securities in reliance upon those false and misleading statements.

101.    Plaintiff Holtz relied upon the statements contained in China Green's above-referenced annual and quarterly filings to perform careful analysis of China Green's reported operational performance and the value of its reported assets and equity in order to inform his decisions to purchase and to retain China Green securities as part of his family's investment portfolio.

102.    Plaintiff Holtz continued to revisit and update his analysis based on each subsequent filing at regular interval throughout the relevant time period.

103.    Plaintiff Holtz further shared elements of his analysis and evaluation of China Green's securities in regular electronic communications with third-parties through an e-mail distribution list, including Plaintiff Sherman, who relied upon them in turn.

104.    When the above representations were made, Plaintiffs were ignorant that the representations were false and justifiably believed them to be true.

105.    Plaintiffs relied upon these representations by retaining and continuing to hold their shares in China Green throughout the relevant time period.

1

**DEFENDANTS' FALSE STATEMENTS CAUSED PLAINTIFFS' LOSSES**

2

106.    Plaintiffs invested significant sums of money in China Green's securities in reliance

3

upon Defendants' statements of financial condition in China Green's periodic filings with the SEC.

4

107.    Since Plaintiffs purchased their shares in China Green, the market value of those shares

5

has slowly but inexorably declined as the market came to reflect the falsity of Defendants' statements

6

and the unreliability of China Green's reported business and financial condition.

7

108.    Had Plaintiffs known the true facts, they would never have purchased their shares in

8

China Green or would have sold their shares in the Company at an earlier date to minimize their losses.

9

109.    Plaintiffs relied upon Defendants' above statements in continuing to hold China Green

10

shares and to invest funds in additional China Green shares.

11

110.    As a direct and proximate result of Defendants' false statements and omissions

12

regarding China Green's financial performance, Plaintiffs were damaged when the price of China

13

Green's securities declined.

14

**FIRST CLAIM**

15

**Against All Defendants Intentional Misrepresentation**
**Pursuant to Cal. Civ. Code §1710(1)**

16

111.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth

17

above, as though fully set forth herein.

18

112.    California Civil Code section 1709 embodies the common law of fraud. It provides:

19

"One who willfully deceives another with intent to induce him to alter his position to his injury or risk,

20

is liable for any damages which he thereby suffers." Civil Code section 1710 sets forth the elements

21

of actionable fraud. It provides: "A deceit, within the meaning of the last section, is either: (a) The

22

suggestion, as a fact, or that which is not true, by one who does not believe it to be true; (b) The

23

assertion, as a fact, or that which is not true, by one who has no reasonable ground for believing it to

24

be true; (c) The suppression of a fact, by one who is bound to disclose it, or who gives information or

25

other facts which are likely to mislead for want of communication of that fact; or (d) A promise, made

26

without any intention of performing it."

27

28

113.   As set forth above, Defendants made false and misleading statements of material fact, to Plaintiffs, and omitted to disclose to Plaintiffs, material facts regarding China Green, in connection with Defendants' sale of securities to Plaintiffs as set forth herein, and in connection with Defendants' periodic annual and quarterly filings with the SEC and related statements of financial performance and condition.

114.   Defendants knew that the above-listed statements were false when made. Defendants knew or had access to information suggesting that China Green's public statements were untrue and/or materially misleading, but they failed to disclose that information.

115.   Defendants intended to defraud Plaintiffs. Defendants benefitted from the fraud in the form of increased investment in China Green, which Defendants converted to their own personal use.

116.   Plaintiffs justifiably relied on Defendants' representations and false statements.

117.   Had Plaintiffs known the true facts regarding Defendants' false and misleading statements, Plaintiffs would not have purchased the China Green securities.

118.   As a result of the Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs suffered damages.

## SECOND CLAIM

### Against All Defendants for Negligent Misrepresentation
### Pursuant to Cal. Civ. Code §1710(2)

119.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

120.   Defendant's material misrepresentations and omissions set forth above were made without any reasonable ground for believing that the representations were true.

121.   Plaintiffs justifiably relied on the material misrepresentations and omissions of Defendant and was induced to purchase China Green securities.

122.   Had Plaintiffs known the true facts, Plaintiffs would not have purchased the China Green securities.

123.   Had the Plaintiffs learned the true facts after purchasing China Green securities, Plaintiffs could and would have sold the securities and/or taken other actions available to them to

mitigate the risk posed by their investment, and were induced to retain and continue to hold their China Green securities throughout the relevant time.

124.   As a result of the Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs suffered damages.

### THIRD CLAIM

**Against All Defendants for False or Misleading Statements in Connection with the Purchase or Sale of Securities**
**Pursuant to Cal. Corp. Code §25400(d) and §25500**

125.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

126.   Defendants, for the purpose of inducing the purchase or sale of such security by Plaintiffs and other similarly situated made statements of material fact which were, at the time and in the light of the circumstances under which they were made, false or misleading, and which they knew or had reasonable ground to believe were false or misleading, in connection with Defendants' sale of securities to Plaintiffs as set forth herein, and in connection with Defendants' periodic annual and quarterly filings with the SEC and related statements of financial performance and condition.

127.   Defendants knew or had reasonable grounds to believe that the above-listed statements were false when made. They knew or had access to information suggesting that China Green's public statements were untrue and/or materially misleading, but they failed to disclose that information.

128.   Defendants made these false and misleading statements for the purpose of inducing Plaintiffs and other similarly-situated investors to purchase China Green securities, and with the specific intent to affect the price of China Green securities in order to induce their purchase by Plaintiffs and other investors.

129.   Defendants intended to defraud Plaintiffs. Defendant benefitted from the fraud in the form of increased investment in China Green, which Defendants converted to their own personal use.

130.   Plaintiffs were unaware of the falsity of, and justifiably acted in reliance upon Defendant's representations and false statements in purchasing, and in retaining and continuing to hold, China Green securities.

131.   Had Plaintiffs known the true facts regarding Defendant's false and misleading statements, Plaintiffs would not have purchased the China Green securities.

132.   As a result of the Defendants' false and misleading statements and omissions, as alleged herein, Plaintiffs suffered damages.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against Defendants as follows:

(a)   Money damages to compensate Plaintiffs for their losses, including the amount of Plaintiffs' total investment in China Green;

(b)   Money damages for expectation and/or lost opportunity costs; and

(c)   Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated:  September 9, 2020                    Respectfully submitted,


                                             **THE ROSEN LAW FIRM, P.A.**

                                             By:/s/Laurence M. Rosen
                                             Laurence M. Rosen, Esq. (SBN 219683)
                                             355 South Grand Avenue, Suite 2450
                                             Los Angeles, CA 90071
                                             Telephone: (213) 785-2610
                                             Facsimile: (213) 226-4684
                                             Email: lrosen@rosenlegal.com

                                             *Counsel for Plaintiffs*